ALLEN, Chief Judge.
The appellant, Robert Earl Williams, was indicted by the Grand Jury and tried in the Circuit Court of Lee County on charges of murder in the first degree. The indictment charged Williams “did unlawfully and, from a premeditated design to effect the death of another human being, murder one Lester B. Sumner, contrary to the statute in such case made and provided, and against the peace and' dignity of the State of Florida.” The jury found the defendant guilty of murder in the first degree and a majority recommended him to the mercy of the court. Thereafter, he was sentenced to life imprisonment.
Williams was convicted of murdering Lester B. Sumner in April of 1965. Sumner was a foreman for the State Road Department, working out of Pine Island Camp, a road prison of the Division of Correction in Lee County. On April 26, 1965, Sumner and his truck driver, Scott, were working four prisoners, the appellant Williams, Al-ligood, Wingard and Jones. The prisoners were worked without being under close custody, and neither Sumner nor Scott were armed on the morning in question.
The prisoners were assigned a job for that day to mow the right-of-way on Bunche Beach Road, located in Lee County, Florida. They arrived at the scene in a State Road Department truck towing a trailer. Work was commenced at approximately 9:00 A.M. Subsequently, Wingard approached Scott and asked him, “Boss, what time is it ?” Scott answered, “It’s five minutes to ten,” when something hit him in the back of the head.
Jones was approximately 125 to 150 feet in front of the truck putting down work signs and Sumner was in back of the trailer approximately 50 to 75 feet away. Williams was in the center of the highway walking toward Sumner. Scott did not know where Alligood was at the time. Shortly thereafter, Williams came to the truck and said to Alligood, “The damn fool tried to play hero and I had to stick him.”
Neither Scott nor Jones saw the scuffle between Williams and Sumner and Win-gard and Alligood did not testify. Williams testified that he put his hand on Sumner’s neck when Sumner started to go to Scott. Sumner said, “Don’t do that,” and jumped around, holding Williams. Williams said he tripped over Sumner’s foot when Sumner tried to pull Williams in front of him. Williams testified that he did not realize a blow had been struck until’ he saw the blood hit the ground. Williams and Alligood placed Sumner in the cage of the truck with Scott and the fourth prisoner, Jones, who took no part in the incident.
The truck was driven to a side road, where Scott’s clothes, his watch and his wallet were taken. Scott was chained to a cabbage palm tree; the trailer was unhooked and the truck was driven away with Alligood at the wheel.
Williams and Alligood were apprehended on Route 41 approximately 10 miles east of Naples, Florida, at approximately 1:00 RM. by Patrolman Peacock of the Florida Highway Patrol, who had been given specific orders to find them. They were wearing khaki colored clothing when apprehended.
The ultimate facts set forth above were taken from the brief of the appellant in this case.
Williams plead guilty to a charge of escape and was sentenced to five years in the State Penitentiary. Alligood was also sentenced to five years for escape, which he appealed and his conviction has been recently affirmed by this court. Alligood was also convicted of murder in the first degree in a separate trial in the Circuit Court of Lee County with a recommendation for mercy. He also was sentenced to life imprisonment for his part in this crime.
The following points were stated by the appellant in his brief:
1. Did the court commit reversible error by admitting into evidence a photograph of the dead body of the deceased?
*754 2. Did the court commit reversible error by admitting statements of the accused to a witness for the state as a part of the res gestae ?
3. Did the court commit reversible error by permitting the investigator of the sheriff’s department to testify as to incriminating statements made by appellant in violation of his constitutional rights?
4. Did the court commit reversible error by permitting the highway patrolman and the deputy sheriff who apprehended appellant to testify as to incriminating statements made by appellant in violation of his constitutional rights?
5. Did the court commit reversible error by failing to fully and adequately charge the jury as to all elements of the crime with which appellant was charged ?
6. Did the court commit reversible error by denying the motion of appellant for a directed verdict of acquittal ?
We conclude from a study of all of the testimony in this case that no reversible error was committed by the trial court and shall affirm the conviction of the defendant.
There was conflicting evidence in the record but this was- reconciled by the jury against the defendant.
The witness Wilber Wimberly testified that he was employed by the Division of Corrections as a captain of the road prison; that on the 26th day of April, 1965, he had in his custody Robert Earl Williams, Alli-good, Wingard and Jones; that they were sent out on a work detail accompanied by Mr. Lester G. Sumner and Mr. S. W. Scott. He also stated that Wingard, Jones, Alli-good and Williams were wearing their State issue clothes, gray pants with white stripes down the side when they went to work on the morning in question.
Mr. Sam W. Scott was placed on the stand by the State’s Attorney and stated that he was employed by State Road Maintenance as a truck driver for the State Road to take prisoners out to their jobs. He testified that on this day in question Robert Earl Williams, Alligood, Wingard and Jones were carried out to this work job; that Mr. Lester B. Sumner was the guard on duty, and at approximately ten o’clock the prisoners made a break. The following testimony was given by Mr. Scott:
“Q. Please tell us exactly what you saw them do, what you know they did.
“A. Well, one of the boys came up to me. Wingard came up to me and asked me ‘Boss, what time is it?’ I looked at my watch like that. I said ‘It’s five minutes to ten.’ And something hit me in the back of the head.”
Mr. Scott then stated that he did not know who hit him; that Lester B. Sumner was at the back of the trailer; that Robert Earl Williams was in the middle of the highway walking toward Mr. Sumner. He stated that the next thing he noticed was a knife “in my stomach.” He further testified:
“Q. Who put the knife in your stomach ?
“A. Wingard.
“Q. Could you feel it ?
“A. Yes, sir.
“Q. Could you see it?
“A. Yes, sir.
“Q. What kind of a knife was it ?
“A. It was a long knife. I say the blade was approximately three inches long. I couldn’t tell how long the handle was.
“Q. What did he say when he put this knife to your stomach?
“A. He said, ‘Boss, don’t make no trouble. I don’t want to use this knife.’
*755 “Q. Then what happened?
“A. And he told me to take my hands down off of him, so I did. I taken my arm from around his neck. I had him around the neck. And I taken my arms down and he came, and when he done that he kinely got up, kinely raised up off of me. But he still had the knife in my stomach. At that time Alligood came and put a rope around my neck.
“Q. What did they do then ?
“A. They drug me into the cage. The cage is the thing on the back of the truck that we carry the prisoners in.
« * * *
“Q. Who drug you in there?
“A. Alligood, with a rope.
“Q. And where was Sumner at that time?
“A. I can’t answer that because I didn’t see him.
“Q. And did you then see Robert Earl Williams ?
“A. No, sir, not at that time.
“Q. When they dragged you to that cage, what did they do?
“A. Well, they put this rope over the cage door kinely as a line and pulled down on it and held it down and was choking me.
“Q. Where were you ?
“A. I was in the seat of the cage. They have seats on each side.
“Q. And when did you next see Robert Earl Williams ?
“A. He came to the truck. I can’t say how many minutes or anything like that. He came to the back of the truck the last time, the first time I saw him after he was walking down the road, and said to Alligood, he said ‘Alligood—
«* * *
“Q. When he came there, what did he say?
“A. He made a statement to Alligood, he said ‘Alligood, the damned fool tried to play a hero and I had to stick him.’ ”
The witness Scott then stated that after Williams made this statement to Alligood the prisoners took him and Mr. Sumner to the woods. He testified:
“A. They taken me and Mr. Sumner— Mr. Sumner had been throwed just before this, Mr. Sumner was throwed in the truck.
“Q. Who throwed Mr. Sumner in the truck ?
“A. Williams and Alligood.
“Q. You say they throwed him. What did they do ?
“A. One by the leg and one by his arm and throwed him up in the truck.”
Mr. Scott further testified that he saw blood all over the front of Mr. Sumner’s shirt; that the prisoners shut the cage door, put a pin in the cage door and took them to the woods. Scott still had the rope around his neck at that time.
He then testified:
“Q. Then after they drove you to this spot in the woods, what did they do?
“A. They got me out the truck and set me ‘side the road and told me to take my clothes off and my boots. And they wanted my wallet and my watch.
“Q. At that time were you in fear of your life?
“A. Yes, sir.
*756 “Q. Did you do what they said ?
“A. Yes, sir.
“Q. Did you give them your watch?
“A. Yes, sir.
“Q. How about your wallet?
“A. I gave them my wallet and my watch.
“Q. Who did you give them to?
“A. I gave ’em to Alligood.
“Q. What about your clothes?
“A. My clothes, I laid 'em down there. I didn’t give any clothes to nobody. They was just laying down where I laid ’em down.
« * * *
“Q. Then what did they do ?
“A. They taken me — Alligood and Win-gard, Alligood taken a rope, it was around my neck, and pulled me out in the bushes out to the side of the little road out into the undergrowth and told me to lay down on my stomach.
And Alligood or Wingard — I can’t say which one of them — one of them brought a long chain and put around my neck. And they had a little lock and they tried to lock it around my neck but the lock wouldn’t go together.
And Wingard said ‘Well, I can tie it up with wire where he can’t get it off.’ And he taken this chain and wired it around my neck, taken the other end of it and put it around a palmetto cabbage palm out to the side.
« * * >fi
“Q. Then what did they do?
“A. After they got down there they unhooked the trailer that would carry these mowers in and turned the truck around and went back out, left me tied up there chained to the tree.
“Q. Who was driving the truck at that time?
“A. Alligood.
“Q. Where was Williams at that time?
“A. That I can’t answer.
“Q. Was he on the truck?
“A. Yes, sir, I presume so.
“Q. Had he been on the truck before you had been taken off?
“A. Yes, sir.
“Q. Do you have the watch with you that was taken from you on that day?
“A. Yes, sir.
“Q. Do you have the wallet with you ?
“A. Yes, sir.
“Q. This is the same wallet and same watch ?
“A. Yes, sir.”
These items were introduced into evidence without objection.
“Q. Who did they belong to at that time?
“A. Myself.
“Q. And they were taken from you by force or putting you in fear?
“A. I would say fear, more than anything. I was doing what they said.
“Q. But you didn’t give it to them voluntarily ?
“A. No, sir.
“Q. All right. Then what happened?
“A. Well, they taken the truck and when Alligood — Wingard got through tying me up, he told me, says ‘Mr. Scott, don’t you try to get loose be *757 cause if you do we’re going to be back here in about 30 minutes.’
So they taken the truck, turned it around and went back out the old road. And I heard him go down the highway to pick up the flags.
“Q. Where was Mr. Sumner at that time?
“A. Mr. Sumner, I presume, was still in the truck.
“Q. Had he been in the truck the last you had seen of him?
“A. Yes, sir.
“Q. During the time did you see any weapon on the person of Robert Earl Williams?
“A. Yes, sir.
“Q. What did you see?
“A. A long knife stuck between his belt and his pants. But the knife was on the outside of his pants, laying against his leg.
“Q. Did it look like a bayonet?
“A. Yes, sir.
“Q. Now, when you were driven to this spot in the woods, before you were taken out of the truck did you take a good look at Lester Sumner?
“A. Yes, sir, I did.
“Q. At that time did you see any evidence as to whether or not he was dead or alive?
it ‡ ‡ stc
“A. Yes, sir, he was laying in the truck kinely on his back with one leg drawed up under him. And he was bloody all in the front from his belt up. I would say he was bleeding from his belt up.
“Q. Did you observe any indications of whether or not he was breathing?
“A. No, sir, he was not.
“ * * *
“Q. Did you form an opinion as to whether or not Mr. Sumner was dead or alive at that time?
“A. I formed the opinion Mr. Sumner was dead at that time.”
On cross-examination, Mr. Scott testified as follows:
“Q. Do you recall making the statement that it was Jones who took the rope from around your neck?
“A. No, sir, I didn’t make that statement, I don’t think.
“Q. I’d like to read to you a portion of your testimony: ‘Q Did you ask anyone to remove it? A I asked somebody, I said — I asked Alligood, I said “Alligood, loosen that rope and give me a little air. It’s choking me.” He said “You wouldn’t give me no dammed air.” And one of them reached in there, Jones reached in and pulled it loose a little bit.’
“A. Wait a minute. That’s a statement I said when he was choking me. I didn’t say he removed the rope. I said he loosened the rope.
“Q. But the rope was not removed by Jones at that time?
“A. No, it was not removed at that time. He put his finger in there and loosened it. It was a slip knot, and he just took his finger in there and pulled it apart so it would — I could get a little air.
« ;fc ;fe *
“Q. You said that you had been hit on the head, I believe?
“A. That’s right.
“Q. You don’t know who hit you?
“A. No, sir.
“Q. Did you lose consciousness ?
“A. Well, for a second or two, yes, sir.
*758 “Q. Did you get back in the truck under your own power after you were hit ?
* * *
“A. Yes, sir. I got up on the truck. I had to get up there.
“Q. You did get up on your own power?
“A. Yes, sir.
“Q. And do you know who hit you ?
“A. No, sir. The only one that could possibly hit me would be Alligood because he’s the only one that I didn’t know exactly where he was at the time I was hit.”
Robert Daubenspeck was called as a witness by the State and testified on direct examination that his occupation was that of an investigator for the Lee County Sheriff’s Department. He stated that he had participated in the investigation of this case and that he had had occasion to talk to the defendant, Robert Earl Williams.
At the request of the defendant’s attorney and the State’s attorney, the court excluded the jury from the courtroom and the following testimony was taken:
“Q. Directing your attention to the 27th day of April of this year, I will ask you if you talked to the Defendant, Robert Earl Williams, about this case at that time?
“A. Yes, sir.
“Q. At that time that you talked to him was he advised of his constitutional rights ?
“A. Yes, sir.
“Q. What was he told?
“A. He was told that he didn’t have to tell me anything and if it was — if he did say anything, that it could be used in Court against him and that he could have an attorney before he told me anything.
“Q. Where did this conversation take place?
“A. It took place in the Lee County Jail.
“Q. And about what time of day was it ?
“A. It was in the evening.
“Q. Now, after you spoke and advised him of his rights, did you ask anybody to transcribe what he had to say?
“A. Yes, sir.
“Q. Who was that?
“A. A Court Reporter. If I might back up a little bit, I talked to him the evening that he was brought up to the jail. And then the next day I talked to him. And my notes and all that are in that box over there.
“Q. At the time the statement was transcribed, immediately before that time did you advise him of his rights ?
“A. Yes, sir.
“Q. Had you advised him of his rights prior to then?
“A. Yes, sir, each time.”
(The State’s Attorney offered the transcript into evidence.)
The attorney for the defendant then cross-examined the witness, Daubenspeck.
The court, at the conclusion of the cross-examination, permitted counsel for the defendant to call to the stand the defendant, Robert Earl Williams, for a limited purpose. Williams stated that he had been taken to the Collier County Jail in Naples and that he had asked to see an attorney but that he had never received permission to see an attorney.
The following testimony was taken concerning this:
“Q. After arriving there, did you ask to see an attorney?
“A. Yes, sir. I asked the desk man behind the desk in the booking room *759 at the Lee County Jail and he said it would be later on. And I asked Mr. Daubenspeck before I made any statement to him if I could make a phone call to consult a lawyer. And he said — I forget offhand just exactly what he did say, but I didn’t make no phone call.
“Q. Did Mr. Daubenspeck or anybody else tell you that you didn’t have to make a statement?
“A. No, sir.
“Q. Did they advise you that you had a right to see an attorney?
“A. No, sir.
“Q. Did they tell you that any statement you might make could be used against you?
“A. No, sir. Let me clarify one point. He did say that I didn’t have to make a statement. He said I didn’t have to make a statement if I didn’t want to. But he didn’t say as far as whether it would be used against me or not. He didn’t elaborate on that, didn’t say anything at all about that.”
Defendant Williams, on cross-examination, said after he was brought up from the Collier County Jail he asked if he could contact an attorney. He testified as follows:
“Q. So you asked Daubenspeck on two occasions in Lee County if you could contact an attorney and you say you asked once in Collier County?
“A. Yes, sir.
“Q. Who did you ask in Collier County ?
“A. I don’t know his name. I guess he was the booking officer on duty at that time,”
Mr. Daubenspeck was recalled to the stand and was examined by the State’s Attorney.
“Q. Mr. Daubenspeck, I believe you had stated that you had talked with this Defendant about this case, is that correct?
“A. Yes, sir.
“Q. Prior to talking to him had you advised him of his constitutional rights ?
“A. Yes, sir.
“Q. What had you told him ?
“A. I told him that he didn’t have to tell me anything and if he did talk it could be used in Court for or against him and that he was entitled to an attorney.
“Q. When did you first advise him of this? •
“A. The first time was the evening that they were picked up and brought to the Lee County Jail.
“Q. Would that be the 26th ?
“A. Yes, sir.
“Q. Did you again advise him of this ?
“A. Again?
“Q. Yes.
“A. Again advised him the next day when I talked to him around noon.
“Q. And did he at either of these occasions or any time tell you that he wanted to get in touch with a lawyer?
“A. No, sir.
f(Q. Did he tell you he wanted to call his mother to see if she couTcT get a lawyer for him ?
“A. No, sir.
“Q. Directing your attention first to the conversation that you had with him on the day of the arrest, what did he have to say about this matter? Let *760 me ask you this first. Did he give a voluntary statement on that day?
“A. Yes, sir.
“Q. Were any threats, offers of reward or offers of leniency made to him on the day of arrest to induce the statement, induce him to give the statement he gave you?
“A. No, sir.
“Q. What did he say?
“A. I talked to all those that were apprehended and he was the third one, as I recall, and they were in the admitting room of the Lee County Jail. And they were standing behind the bars.
“ * * *
“Q. And what did Williams have to say?
“A. I asked him the circumstances and showed him a knife. I asked him what happened and showed him the knife that I had picked up at the scene of the clothes changing the other side of Naples.
“Q. What did he have to say about this knife ?
“A. He said that was the knife he found out on 80 east of Fort Myers and that he was working with the grass crew and that he cut it off and put it in a can of grease on the highway truck and kept it there.
“Q. Did he say what he had done with knife that day?
“A. He said that day that he was involved in this incident, yes. He told me that he had the knife in his right hand when he approached Mr. Sumner and put the point of the knife into his stomach and told him to stand still and, however, Mr. Sumner did not stand still. He struggled and grabbed his arm and caused quite a lot of commotion. And he said that in the process Mr. Sumner got cut by him.”
Subsequently, Mr. Daubenspeck stated that Williams told him how Mr. Sumner was put in the back of the truck after he was cut and that they also put another inmate by the name of Jones into the back of the truck because he didn’t want to go along on the escape. Then the following testimony by Daubenspeck took place:
“Q. Did they say what they did with Scott at that time?
“A. They took Scott out of the truck and tied and chained him to a tree.
“Q. Did he tell you what they did then ?
“A. Yes. They then went back and took the back road down across to 41 and went south on 41 to Bonita Springs.
“Q. Did he tell you who was in the car with them when they were traveling down there?
“A. Yes. There was Alligood and Williams himself and Mr. Sumner was in the back with Jones.
“Q. Where did they go? Did he tell you where they went?
“A. They went to Naples where he took off Mr. Scott’s shirt and went into a variety store and bought three suits of clothes that consisted of three shirts and three trousers.
“Q. Who was this?
“A. Williams.
“Q. Did he say what he did with these clothes ?
“A. Yes. After they left there they went to below Naples, pulled off on a side road and changed clothes and tossed away the prison clothes.
*761 “ ‡ * ‡
“Q. Did he tell you whether or not anything was taken from Mr. Scott or Mr. Sumner?
■ “A. Yes, They took their watches and billfolds as well as their clothing and the truck.
“Q. Did you ask them whether or not this escape had been planned previously ?
“A. Yes, sir, I did.
“Q. What did he say ?
“A. He said ¿bout three weeks to a month.
“Q. Did he say who had planned it?
“A. This same crew, which works together, had been working together for sometime, consists of Alligood and Wingard and Williams. And Jones was — .
“Q. Did he say how they had planned to escape ? Did he tell you how they had planned to escape?
■“A. Yes. They was going to get the keys to the truck and get control of the two highway supervisors and take off.”
Later Mr. Daubenspeck testified:
“Q. Did the Defendant tell you whether they had gotten any money from either Mr. Sumner or Mr. Jones?
"A. Yes, sir.
“Q. How much did he say they had gotten ?
"A. $2.
“ * * *
“Q. Did he say whether they had gotten anything else from them?
“ * * *
"A. He stated that Alligood and Win-gard and himself [Williams] got the two watches from Mr. Sumner and Mr. Scott and the billfold from Mr. Sumner and Mr. Scott.”
He further testified that Williams told him that after going through Naples they pulled off on a side road and Wingard then took off walking away from the group. This is the point where they changed their clothes.
Trooper J. D. Peacock of the Florida Highway Patrol was sworn as a witness for the State and stated that he was employed as a patrolman on the 26th day of April of 1965; that he saw the defendant Robert Earl Williams that day at approximately ten miles east of Naples on the old Bell Meade Crossing road; but that he had first seen him on U. S. 41 while patrolling the highway in search for a State Road truck, which he knew from a report some escaped prisoners were in; that he stopped Williams, who was accompanied by Alli-good; and that they were dressed in khaki or tan working pants and shirts.
Mr. Peacock then testified as follows:
“Q. When you first stopped Mr. Williams and Alligood, were you talking to them?
“A. Yes, sir.
“Q. What did you say to them ?
“A. The first words I said, I called to them to come toward me. And they got 15, 20 feet from me. The first thing I said to them was ‘Why did you boys leave Fort Myers like you did?’
“Q. Were you just playing a hunch then ?
“A. Yes, sir.
• “Q. What did they say?
“A. Williams here hesitated a minute and he said ‘We’re not gonna — ’ — in this gesture, ‘We’re not gonna give you any trouble, Boss.’ Then *762 I realized I had the people I was looking for.
“Q. You were armed at that time, were you not?
“A. Yes, sir; but my gun was in my holster.
“Q. Then what happened?
“A. I brought ’em to the patrol car and had ’em to bend over the hood of the car and where I put the handcuffs on ’em. I handcuffed them together. At the same time I was talking mostly to Williams here about where the truck was at.
“Q. Did he say or tell you where the truck was at ?
“A. The words that he used, ‘The truck’s back up that road back up there.’ He didn’t call the name of the road.
“Q. Did you look back up that road?
“A. After I got ’em handcuffed and got ’em into the patrol car I proceeded back toward the way he was telling me. And he was showing me the road which they had taken the truck down.
“Q. Did you find any truck there?
“A. I found the truck on the old Bell Meade Crossing road which he directed me to.”
Trooper Peacock then stated that he swung around to the rear of the truck and looked in toward the cab but didn’t find anything in that section so he came back and hollered out, “Who’s in there with you?” He testified:
“A. A voice came out, T am,’ and ‘This man is hurt.’ And I looked back to the rear of the truck. And Mr. Bob McCloud was driving up at that time. And I asked him to watch the prisoners that I had in my car while I went up into the truck to unlatch, take the screwdriver out of the eye and the latch of the cage of the truck. And there’s where I found the prisoner by the name of Jones, and Mr. Sumner.”
Mr. Peacock then stated that Mr. Sumner was on the floor of the bed of the truck, and that he checked and could not find any breathing at all. He said his opinion was that Mr. Sumner was dead at that time. Mr. Peacock further testified:
“Q. Then did you talk any further with the Defendant?
“A. Yes, sir. After I got prisoner Jones out of the truck and got him down, I asked Williams and Alli-good to come behind my patrol car. And at that time I gave ’em a more complete search and I asked them at the same time ‘Which one of you boys killed that man up there?’ And Williams replied.
“Q. What did he say ?
“A. He said T done it, Boss. I cut him.’
“Q. When Williams told you this and just prior to then or at any time since you had met him that day, had you made any threats to him?
“A. No, sir.
“Q. Or offers of reward or leniency to induce him to make any statement?
“A. No, sir. In fact, I had already holstered my gun again. I pulled it out as I pulled up to the truck. But I had already holstered my gun.
« ‡ 5(C
“Q. Did he [Williams] make any further statement to you relating to this?
“A. Later.
“Q. How much later was that ?
“A. A couple of minutes or so, when Officer Kitchell of the Collier *763 County Sheriff’s Department and Officer Don Harris came up.
“Q. Where was McCloud at that time?
“A. He was standing right side of me at that time.
“Q. What did you say at that time?
“A. I looked around to Mr. McCloud and told him ‘Bob, remember that.’
‡ s|c *
“Q. Now, on the second statement, what did you say and what did he say?
“A. I asked him again ‘Who killed the man in the truck?’ He again admitted it, saying ‘I killed him.’ ”
Trooper Peacock then testified that he searched Williams and Alligood and found pocketknives on both of them.
Subsequently, Robert Earl Williams was again placed on the stand by his attorney and he testified that Wingard was not the one that cut the Walking Boss. Williams testified:
“A. ‘ * * * I’m the one that cut the Walking Boss in an accident. Specifically and plainly, it was an accident.’
“ * * *
“A. Yes, sir; because I believed that he was going to — Wingard’s capture was imminent, I believed, and that was just left him off about IS, 20 minutes before this, and I figured that they were gonna catch him right away and — well, the difficulties and such that I have been in, well — I won’t get off the track— but it would appear to me that they just might do that. That’s why I told them what I did. That’s why I admitted cutting him.
“Q. To keep Wingard from getting shot before he was given a chance to be brought in?
“A. That’s right.”
Mr. Robert Reed McCloud was sworn as a witness for the State and stated that on the 26th of April, 1965, he had seen Trooper Peacock, that he had made a signal to Mr. McCloud to follow him, which he did, and when he got there there was one of the State trucks pulled off the south side of the road.
The following testimony took place:
“Q. To save time for the purposes of this separate voir dire, I direct your attention to the Defendant Williams here and ask you if you saw him that day?
“A. Yes, sir.
“Q. Did you hear him say anything concerning this matter, make any statements concerning the death of Lester B. Sumner?
“A. Yes. The first time that Peacock asked who killed the man, he said T did. I cut him. It was an accident.’
“Q. This was the first time?
“A. First time.
“Q. At that time when he made that statement, was that a voluntary statement ?
“A. Yeah.
“Q. Did you hear him make any subsequent statements later on?
“A. Yes. Later on he said something like — I think he said ‘I killed him.’
“Q. On either of these occasions were any threats or offers of reward or offers of leniency made to him to induce him to make these statements ?
“A. No, sir.
<( * * *
“Q. Was Trooper Peacock present when you heard these statements?
“A. Yes, both times.
*764 “Q. Were they spoken to him ?
“A. Yes, not to me.
“Q. Where was this that he made these statements?
“A. At the scene between his car and my pick-up truck.
“Q. At the scene of the truck — ?
“A. That’s right.”
Mr. Kenneth Kitchell, a deputy sheriff of Collier County, testified that he saw the defendant, Robert Earl Williams on April 26th, 196S, then testified as follows:
“Q. Will you state, please, how the circumstances were leading up to your seeing him.
“A. Well, approximately 1:15 this particular day we received a call by radio that Trooper Peacock had had these subjects down on the road, which was on our signal was signal six, approximately ten miles east on 41. I proceeded down there to Tropper Peacock. That’s when I first seen him.
“Q. Did you see Trooper Peacock there?
“A. Yes, I did.
“Q. And was the Defendant Williams there ?
“A. Yes, sir.
“Q. When you arrived there, what did you do?
“A. I talked to Williams here.
“Q. What was Peacock doing at that time?
“A. He was up at the back of the State Road Department truck.”
Mr. Kitchell stated he discussed several things with Williams then Williams advised him he had killed the man. Then the following testimony was adduced:
“Q. When he made the statements to you, were any threats or offers of reward or offers of leniency made to him to induce him to make these statements ?
“A. No, sir, he did not.
“Q. They were voluntarily made?
“A. Yes, sir, all the way.
“Q. And he admitted that he had killed the man in the truck?
“A. Yes, sir.”
On cross-examination, Mr. Kitchell testified:
“Q. At the time you arrived at the scene, did Trooper Peacock tell you that Williams had admitted killing Sumner?
“A. Yes, sir; Williams had admitted killing Sumner in the presence of the other prisoners plus in the presence of Trooper Peacock and myself.
“Q. So you were there when that statement was made?
“A. Yes, sir.
“Q. Now, you say that you questioned him and he made the statement before he was in your patrol car?
“A. Before and after, yes, sir.”
Mr. J. D. Peacock was again placed on the stand and repeated in greater detail the testimony which he had previously given. He stated he had talked to Williams and answered the following question:
“Q. What did he [defendant Williams] tell you?
“A. I asked Williams and Alligood in a general statement concerning ‘Which one of you boys killed that man up there in that truck?’ And Williams said T cut him, Boss. I didn’t mean to kill him, but I cut him.’ ”
*765 Mr. Robert McCloud was again called and repeated much of his testimony previously given before the court concerning what William had said, such as:
“A. Yeah. Williams said something like ‘I cut him’ or ‘I struck him. It was an accident.’
“Q. And were any threats, offers of reward or offers of leniency made to Williams to induce him to make this statement?
“A. No, sir.”
Kenneth Kitchell, who had previously testified before the court, was again placed on the stand and testified as follows:
“Q. When you arrived there what did you see?
“A. Well, I arrived at the scene and I seen a State Road Department truck off in the ditch and Trooper Peacock and Williams here and Jones. And I don’t recall the other prisoner’s name.
“Q. Three prisoners?
“A. Yes, sir.
“Q. Did you hear Trooper Peacock speak to Williams?
“A. Yes, sir.
« * * *
“Q. Did anyone admit who had done the ' killing?
“A. Yes, sir.
“Q. Who admitted it?
“A. Williams advised that he had done the killing. Also, he advised that • Jones didn’t have nothing to do with it.
“Q. Who was present at that time?
“A. It was Don Harris, Bob McCloud and Trooper Peacock and Jones and this other prisoner, I don’t recall his name.”
Donald Harris was sworn as a witness for the State and stated he was a deputy sheriff with the Collier County Sheriff’s Department. He testified, in part, as follows:
“Q. Who was in the car at that time?
“A. In the meantime we had loaded Alli-good and Williams into the car. They were in the back seat of the car. And Kenneth Kitchell turned around to ’em and asked ’em where the fourth one was.
By that time we had found out how many there was supposed to have been with ’em. They stated that they — I think Williams did the talking — he stated that he had slowed the truck down just before they got to a bridge where a dragline was working, arid at that time this other prisoner had jumped off the truck as it was — had slowed down. So we drove back to. this location.”
He further testified that Aubrey Rogers, Chief Deputy of Collier County Sheriff’s Department, walked up and told the boys:
“A. * * * ‘Now, you boys know you’re right, you don’t have to tell us anything, but it would make it easier on everybody if you’d tell us where you changed clothes.’
“Q. Who did he say this to ?
“A. To both men. But Williams answered him and told him — .
“Q. Did Williams say where he had changed clothes?
“A. Yes, sir. He described the place as being on a marl road behind a motel, not too far back down the road.”
Robert Earl Williams, the defendant in this case, was sworn in his own behalf and stated that he was on a road gang working on Bunche Beach Road on April 26, 1965, *766 and that an attempt was made to escape from custody. He testified as follows:
“Q. Now, was there any prearranged plan to make this escape ?
“A. Yes, sir; from myself, there was.
“Q. What was the nature and extent of that plan?
“A. Well, I had decided that at any time that I would leave if I got the chance to go that the circumstances seemed right.
“Q. And had you worked out the details, how you would effect this escape ?
“A. No, sir; it was impossible to do that. Just had to play it by ear. I didn’t know where we’d be or what. You never know when you’re working on a squad. You might go here one day, there the next.
“Q. Now, on this day did you have this knife here that the State has introduced in evidence, this thing?
“A. Yes, sir.
« * * *
“Q. With the Court’s permission, I would like for you to use this ruler and step down from the stand and demonstrate for me the manner in which this blow was inflicted.
<( * * *
“A. Well, Mr. Sumner was standing at the back of the truck and I had come around behind him and placed my yo-yo which I use to cut grass with in the forward wagon. And Mr. Wingard had struck Mr. Scott. I guess he struck him in the stomach. But I looked up and they were rolling on the ground. Mr. Sumner started to go toward him and turned around this way. I put my hand on Mr. Sumner’s neck and he said ‘Don’t do that,’ and he jumped around and was holding onto me. I said ‘I got a knife now. You’d better quit.’ You know, he grabbed me by the hand and—
“Q. Like this?
“A. Like that, and started swinging around with me. And we went around in circles. And finally he quit.”
Later in his testimony Williams gave details which have heretofore been mentioned by other witnesses. Then, on cross-examination, Williams was asked how many times he had previously been convicted and he answered, “Six or seven times.” He further testified:
“Q. Let’s go back to the plan you and Alligood had to escape. What were you going to do with Jones and Sumner, carry them with you in the truck ?
“A. I was just gonna leave.
“Q. Why was Mr. Sumner taken in the truck ?
“A. Mr. Sumner climbed up on the back of the truck. I asked him if he could get up in the truck after we picked him up and got him to the foot of the truck, but he was a big man and we couldn’t get him in the truck.
“Q. Did you hear the testimony of Mr. Scott here?
“A. Yes, sir.
“Q. Do you recall him saying, I believe, that you and Alligood threw him in the truck?
“A. Mr. Scott was mistaken. Wingard and myself carried him to the foot of the truck. He came to and I said ‘Can you get up on the truck ?’ And he got up on the truck and got up on the back of the truck and started to fall in. And Mr. Scott came out and Mr. Jones came *767 up and caught him and put him in on the truck.
“Q. Why was he put in the truck?
“A. To get him out of the middle of the road.

Q. Was any signal given [concerning the escape]? Ol
"A. I said ‘I’m ready to go, I’m gonna leave this place.’ <
"Q Who did you say that to ? Ó
"A. Alligood and Wingard who was in front of me yo-yoing. <
“Q. What did they say?
“A. They said ‘Okay, let’s go. Let’s get the keys and get the truck off the road and get in the bushes.’
“Q. Who had the keys ?
“A. Nobody had the keys right then. Wingard went and got ’em.”
We conclude from the detailed testimony above given that the jury could have concluded from the evidence before them that there had been a prearranged conspiracy between Williams, Alligood and Wingard to escape from confinement. As a result of this conspiracy, one of the guards, Mr. Sumner, was killed and the truck driver, who was also acting as a guard, was injured. In addition thereto, the truck driver’s clothes were taken and the guards’ watches and wallets, which contained money, were stolen.
There was ample testimony adduced at the trial to warrant the conviction of murder in the first degree. As the Court said in McCutchen v. State, Fla.1957, 96 So.2d 152,
“The law does not prescribe the precise •period of time which must elapse between the formation of and the execution of the intent to take human life in order to render the design a premeditated one; it may exist only a few moments and yet be premeditated.”
We further conclude from this evidence that no reversible error was committed by the trial judge in his ruling on evidence, and due to the overwhelming testimony against the defendant, if any error was committed, it was a harmless error.
We, therefore, affirm the conviction of this defendant.
Affirmed.
SHANNON and LILES, J., concur.